UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__  12/13/2013
```

HIRAM TORRES,

                    Plaintiff,

       -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.

------------------------------------------------------------X

**12-CV-06527 (LTS)(SN)**

**REPORT AND
RECOMMENDATION**

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE LAURA TAYLOR SWAIN:

       Plaintiff Hiram Torres, appearing *pro se*, brings this action pursuant to Section 205(g) of

the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final

determination of the Commissioner of Social Security (the "Commissioner") denying his

application for Supplemental Security Insurance ("SSI") benefits.[1] The Commissioner moved for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Torres

opposed the motion. Because I conclude that substantial evidence supports the Commissioner's

final determination, and because the administrative law judge ("ALJ") did not commit legal

error, I recommend that the Commissioner's motion be GRANTED.

---

[1] Torres also filed an application for disability insurance benefits on September 14, 2009. Given that
March 31, 2002, was Torres's last date insured and there were no treatment records during that period, the
application was dismissed on request of counsel at the hearing. In addition, Torres repeatedly referred to
asthma and body pain in the documents submitted to the Social Security Administration, in his complaint,
and in his opposition. His attorney, however, explicitly stated that he had only a psychiatric impairment,
and the ALJ did not consider any non-psychiatric conditions.

## PROCEDURAL BACKGROUND

On August 19, 2009, Torres submitted an application for SSI benefits. On November 16, 2009, the Social Security Administration (the "SSA") denied this application, and on January 4, 2010, Torres appealed, requesting a hearing before an Administrative Law Judge. Torres appeared before ALJ Kenneth G. Levin on December 17, 2010 and on February 9, 2011. The Appeals Council denied Torres's request for review of the ALJ's decision on June 15, 2012, thereby rendering the decision of the Commissioner final.

On August 24, 2012, Torres filed this *pro se* action. On October 1, 2012, the Honorable Laura Taylor Swain referred Torres's case to a magistrate judge for a report and recommendation. On October 4, 2012, that referral was reassigned to my docket. On June 20, 2013, the Commissioner filed a motion for judgment on the pleadings with supporting memorandum of law. On July 8, 2013, Torres filed an affirmation in opposition, and on September 3, 2013, the Commissioner filed a reply. Thus, the motion is fully briefed.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

## I.    Medical and Work History

### A.  Evidence Before August 19, 2009

Torres was born on May 19, 1957. Torres has a history of drug use, including heroin, cocaine, and marijuana. He received treatment at the Albert Einstein College of Medicine Division of Substance Abuse ("Albert Einstein College") and Concourse Medical Center ("Concourse"). Records from Albert Einstein College indicate that as of October 2005 Torres received daily methadone. As of July 2007, Torres was abstaining from drug use. Torres began treatment at Concourse in January 2007. On May 22, 2008, a Concourse physician approved

2

Torres to pick up his methadone one day a week instead of five. The reason for the schedule change was to accommodate Torres's work as a stable hand.

In July 2008, Torres reported that he had gone back to work as a day laborer at the Long Island race track. The records indicate that in 2009 Torres was still working as a day laborer and "things in his job [were] going well most of the time." (R. 264.) Torres indicated that at times he had employment stress and conflict with co-workers but stated that he had been employed at the race track for three years and wanted to remain there.

Torres was treated by a psychiatrist from July 2009 through October 2010. Dr. Rajesh Patel performed an initial psychiatric assessment on July 30, 2009. Torres was alert with normal speech, coherent thought processes, and normal impulse control. He was, however, depressed and anxious. Torres reported auditory hallucinations but had no suicidal or homicidal ideation. Dr. Patel prescribed several medications.

**B. Evidence Relating to Period at Issue: August 19, 2009 to March 14, 2011[2]**

**1. Concourse Medical Center**

**a.  Dr. Patel**

Dr. Patel continued to treat Torres from August 2009 through October 2010. Dr. Patel wrote a note to the City of New York Human Resources Administration on September 9, 2009. He stated that Torres was diagnosed with "severe depression with psychotic features" and was being evaluated for "memory impairment." (R. 291.) Dr. Patel also stated the following: "At this time I don't think he is capable to work pending stabilization of his mental problems and evaluation for memory impairment." (Id.) On the same day, Dr. Patel's clinical notes indicate

---

[2] Torres was treated at Martin Luther King Jr. Health Center during the relevant period. Because these records are most relevant to Torres's complaints of back pain and are not relied on in the ALJ's decision, they are not summarized here.

that Torres reported improvement with respect to hallucinations and that he felt more relaxed and less depressed.

On December 23, 2009, Dr. Patel completed a form at the Request of the Social Security Administration. He reported that he had treated Torres on a monthly basis since July 30, 2009. Dr. Patel diagnosed major depression with psychosis, and cognitive disorder, not otherwise specified. He reported that Torres's symptoms were depression, anxiety, auditory hallucinations, and progressive memory loss. Dr. Patel reported treatment with medication and assessed Torres's prognosis as guarded. Dr. Patel described Torres's sustained concentration, persistence, understanding, and memory as limited. He stated that Torres's concentration and persistence were affected by psychiatric medication and methadone. He also stated that Torres's ability to perform calculations was limited, and his insight and judgment were fair. Asked to evaluate Torres's activities of daily living and his ability to function in a work setting, Dr. Patel wrote, "N/A." (R. 189.) Dr. Patel stated that he did not know if Torres was capable of handling his own benefit payments or if Torres had social or adaptive limitations.

On January 13, 2010, Torres reported to Dr. Patel that his medication had helped him and that his auditory hallucinations had stopped. Torres had no perceptual disturbances or suicidal ideation, and his impulse control was normal. Torres's judgment and insight were described as fair to impaired.

Dr. Patel saw Torres on February 24, 2010, and June 16, 2010. Dr. Patel noted that on each of these dates Torres denied any suicidal ideation or hallucinations and described Torres's judgment and insight as fair. On June 16, 2010, Torres reported feeling depressed, sleeping poorly, and having periodic auditory hallucinations. Torres informed Dr. Patel that he was taking his mother's medication because he did not have any of his own.

4

Dr. Patel completed a psychiatric report on October 30, 2010. He again diagnosed major depression with psychosis. Dr. Patel reported that clinical findings included auditory hallucinations, anxiety, and progressive memory impairment. Torres denied any side effects from medication. Dr. Patel noted that Torres did not have a low IQ or reduced intellectual functioning and that Torres could manage his own benefits. Dr. Patel again concluded that Torres's prognosis was guarded.

In this psychiatric report, Dr. Patel placed checkmarks on the form to indicate that Torres had a "[m]edically documented history of a chronic organic mental, schizophrenic, or affective disorder of at least 2 years' duration, that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support," and "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (R. 359.)

In the same report, Dr. Patel put "X's" in boxes to indicate that Torres was seriously limited, but not precluded from: (1) remembering work-like procedures; (2) maintaining attention for two-hour segments; (3) understanding, remembering, and carrying out detailed instructions; (4) setting realistic goals or making plans independently of others; (5) dealing with the stress of semi-skilled or skilled work; and (6) repeating sequences of action to achieve a goal or objective. Dr. Patel assessed that Torres had a limited but satisfactory ability to: (1) understand, remember, and carry out very short and simple instructions; (2) maintain regular attendance and punctuality; and (3) make simple work-related decisions. He also assessed that Torres had no limitations with respect to asking simple questions or requesting assistance. Dr. Patel placed question marks in the "limited but satisfactory" column for abilities such as (1)

sustaining an ordinary routine without special supervision; (2) working in coordination with or proximity to others; (3) completing a normal workday and workweek without interruptions from symptoms; (4) performing at a consistent pace without an unreasonable number and length of rest periods; (5) accepting instructions and responding appropriately to criticism from supervisors; (6) getting along with co-workers and peers; (7) responding to changes in a routine work setting; (8) dealing with normal stress; and (9) repeating sequences of action to achieve a goal or objective. Dr. Patel also indicated that he could not assess certain mental abilities, such as Torres's ability to interact appropriately with the general public, respond appropriately to persons in authority, maintain socially appropriate behavior, or use public transportation.

### b. Substance Abuse Counselor

In addition to seeing Dr. Patel, Torres maintained regular appointments with a substance abuse counselor at Concourse. The counselor's notes contain numerous statements regarding Torres's work history. On August 19, 2009, the counselor stated that Torres continued to work as a stable hand at the race track on Long Island: "[Client] stated he continues to go to work every day, but is having difficulties due to his lack of sleep and depression." (R. 289.) On October 21, 2009, the counselor again indicated that Torres was working: "[he] keeps himself busy with his work schedule. [He] stated working every day keeps him focused." (R. 293.) On December 31, 2009, Torres reported to his counselor that he was maintaining his employment at the Long Island race track, working as a day laborer, and that he was "stable at work." (R. 267.) Torres again met with his counselor on January 13, 2010, and "stated that his employment continues to be stable," and that "he goes to work and back home." (R. 298.) On May 14, 2010, Torres informed his counselor that he was "working from Tuesday through Saturday," and requested that his appointments be changed from Saturday to Monday. (R. 303.)

6

The counselor's notes also indicate that Torres interacted with his family on a regular basis. On October 21, 2009, the counselor noted that Torres had weekly contact with his children. In December 2009, the counselor noted that Torres socialized with his peers and enjoyed bingo and dominoes with his friends. Torres also reported to his counselor in January 2010 that on weekends he spent time with his children and grandchildren. Again, on July 26, 2010, the counselor's notes indicate that Torres maintained contact with his children, and his family relationships were going well.

During the relevant period, the counselor's notes also indicate that Torres's treatment progress was satisfactory or good. There were, however, periodic notations regarding depression and insomnia.

### 2. Dr. Dipti Joshi

Dr. Dipti Joshi examined Torres on October 26, 2009, as part of a consultative examination. The Division of Disability Determination referred Torres to Dr. Joshi for an internal medical examination.[3] Torres reported that he was not homicidal or suicidal, but stated that he was very depressed. Torres reported to Dr. Joshi a history of marijuana, cocaine, and heroin abuse but said that he stopped in 1996. Dr. Joshi noted that Torres was dressed appropriately, maintained good eye contact, and appeared oriented in all spheres. There was no evidence of hallucinations or delusions, nor was there any evidence of impaired judgment or significant memory impairment. Dr. Joshi indicated that Torres did not cook, clean, do laundry, or shop because he was depressed. Dr. Joshi diagnosed Torres with, *inter alia*, depression and panic attacks.

---

[3] The report by Dr. Joshi contains information regarding Torres's physical health. Because Torres dropped his claim based on a physical disability, the ALJ did not consider those portions of the medical record, and they are not summarized here.

### 3. Dr. Herb Meadow

Dr. Herb Meadow, a psychiatrist, evaluated Torres during a consultative examination on October 26, 2009. Torres reported that he lived at home with his mother. He stated that he had a tenth-grade education and knew how to read. Dr. Meadow indicated that Torres last worked in construction in 1999, and stopped working because of asthma. Torres denied a history of drug or alcohol use to Dr. Meadow. Torres reported that he socialized with a friend as well as with immediate family.

The mental status examination revealed that Torres was cooperative and his manner of relating was adequate. Torres was dressed appropriately, neatly, and casually. He was well groomed, and his gait, posture, and motor behavior were normal. Eye contact, however, was reported to be poor. Torres spoke in a low clear voice with some hesitations. His expressive and receptive language was adequate.

Torres's thought processes were coherent and goal directed, with no evidence of hallucinations, delusions, or paranoia. His affect was appropriate in speech and thought content. Dr. Meadow found that Torres's mood was depressed and anxious. Torres was oriented to person and place, but not date. Dr. Meadow considered that Torres's attention and concentration were impaired by limited intellect. Torres could count and add single-digit numbers with his fingers, but was unable to perform serial-3 tests, indicating problems with math. Torres's memory skills were intact, and he was able to repeat three out of three objects immediately and after five minutes. Torres's cognitive functioning was considered borderline, and his general fund of information was limited. Torres's insight and judgment were assessed as fair to poor.

Dr. Meadow diagnosed depressive disorder, not otherwise specified, generalized anxiety disorder, panic disorder with agoraphobia, and cognitive disorder, not otherwise specified.

8

The doctor concluded that Torres would need supervision performing complex tasks and would have difficulty relating adequately with others and dealing with stress. Dr. Meadow also stated that the results of the examination were consistent with psychiatric and cognitive problems, but these problems did not appear to be significant enough to interfere with Torres's ability to function on a daily basis. He identified Torres's prognosis as guarded and noted that Torres would need help managing funds due to his problems with math.

### 4. Dr. L. Blackwell

On November 9, 2009, a state agency psychologist, Dr. L. Blackwell, reviewed the medical evidence of record and assessed Torres's mental residual functional capacity. Based on a record review, Dr. Blackwell determined that Torres was not significantly limited in the ability to: (1) remember locations and work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) work in coordination or proximity to others without being distracted by them; (5) ask simple questions or request assistance; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (7) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (8) be aware of normal hazards and take appropriate precautions; and (9) set realistic goals or make plans independently of others.

Dr. Blackwell found moderate limitations with respect to Torres's ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) sustain an ordinary routine without special supervision; (4) make simple work-related decisions; (5) complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without

9

an unreasonable number and length of rest periods; (6) interact appropriately with the general

public; (7) accept instructions and respond appropriately to criticism from supervisors; (8)

respond appropriately to changes in the work setting; and (9) travel in unfamiliar places or use

public transportation.

Dr. Blackwell indicated that the mental status examination performed by Dr. Meadow

was remarkable for depressed, anxious mood, and mildly impaired attention, concentration and

memory. The results of the examination were consistent with psychiatric and cognitive problems.

He concluded, however, that those problems did not appear to be significant enough to interfere

with Torres's ability to function on a day-to-day basis.

## II.      The Administrative Hearing

Before the hearing, the ALJ subpoenaed copies of Torres's "pertinent mental health, and

very limited medical, treatment records." (R. 15.) On December 17, 2010, Torres appeared for

his hearing, but it was postponed because Torres was in the process of retaining counsel. Before

the rescheduled hearing, Torres's counsel submitted a report and functional assessment from a

psychiatrist at Torres's treatment clinic. On February 9, 2011, Torres again appeared, with

counsel and an interpreter, before the ALJ.

### A.   Torres's Testimony

At the hearing, Torres testified that he last worked in 2001. When asked by the ALJ about

"off the books" work, Torres stated that he was absolutely sure that he never worked off the

books. (R. 31.) When asked about his counselor's records indicating that he worked in a stable,

Torres first stated that he did not remember telling his counselor that he worked, and again stated

that he never worked during the relevant period. The ALJ asked why his counselor would put

10

that information in her notes, and Torres testified, "I don't remember saying that to her. I haven't

worked. Maybe you can ask her the information by writing because I haven't worked." (R. 33.)

      After a brief recess, Torres provided an explanation for his counselor's notes:

> She wanted me to go to the program to pick up my medicine only once so
> I did not have to go seven days a week. She told me she wasn't going to
> go to court if I agree that she would write down that I was working.
> Because I wanted medication and I don't want to have to go back there
> seven days a week, I accepted.

(R. 34-35.) When asked who made this suggestion, Torres stated, "She did because I don't know

anything about it." (R. 35.) Confronted with multiple notes from his counselor indicating that

Torres was working (R. 36), Torres stated, "But this is – this is something that my counselor, she

advised us to do." (R. 36.) When asked to explain why he now claimed he was aware of the

counselor's notes when he had previously stated that he did not know anything about the notes,

Torres stated the following:

> Because at the moment I didn't know what you were talking about. I didn't know
> what you were talking about, but after a while I understood what – I understand
> what it is about. That's what I know now.

(R. 37.)

      Torres also testified that he suffers from nervous problems, including shaking hands,

and that there were days "[w]hen I lose my mind [and] I don't know where I am." (R. 38.) Torres

stated that sometimes he does not know the person who is talking to him, and sometimes he runs

out of the house and does not come back for days because he gets lost. He testified that this last

occurred in September 2010. Torres also testified that at home he will get up and walk around

back and forth. He talks until he is about to lose his voice. His mother and other people think he

is fighting with someone. He screams and speaks until his voice is gone.

Torres stated that he did not help his mother with housework. Asked about clinic notes that stated that he provides his mother with help, Torres testified, "At home, there's a lady that comes around to help her." (R. 40.) Torres also testified, "I'm always home. I never go out." (Id.) Asked about notes indicating he visited family members, Torres stated that he used to visit family when they lived in the Bronx, but they had moved. His children who lived in North Carolina would come to the house to visit him. The ALJ then asked whether Torres ever played bingo or dominoes, and Torres stated that he did not play anything like that. Asked why his records would indicate that he did play bingo and dominoes, Torres stated that he used to play. Torres also acknowledged that he did go out to appointments and went to church weekly.

**B.  Dr. Vitolo**

Dr. Vitolo, a psychiatrist, reviewed the medical records, heard Torres's testimony, and testified at the hearing regarding Torres's condition. Dr. Vitolo assessed that Torres had an organic mental disorder,[4] a major depressive disorder, an anxiety disorder, not otherwise specified, and a substance addiction disorder. Dr. Vitolo testified that while Torres's condition satisfied part A of the listings, it did not meet the requirements of part B or C. Torres had only mild limitations in activities of daily living and moderate limitation in social functioning, concentration, persistence, and pace.

Dr. Vitolo testified that Dr. Meadow's diagnosis of a panic disorder with agoraphobia was not supported by objective findings or by the reports of other treating or examining sources. He noted that neither Dr. Patel nor Torres's counselor had diagnosed or observed symptoms consistent with that diagnosis.

---

[4] A portion of Dr. Vitolo's testimony was transcribed as inaudible with regard to the organic mental disorder.

Dr. Vitolo testified that the record contained no ongoing complaints about memory or forgetfulness. Although Dr. Patel stated that Torres had a progressive memory impairment, there were no objective findings, cognitive evaluations, or mental status examinations supporting such a finding. Dr. Vitolo testified that both Dr. Patel and Torres's counselor stopped mentioning memory problems in the record. Dr. Vitolo concluded that Dr. Patel's residual functional capacity ("RFC") did not indicate a markedly impaired claimant; at most Torres's functioning was moderately limited.

### C. Vocational Expert Testimony

Melissa Fass Karlin testified as a vocational expert at the hearing. Ms. Karlin stated that Torres's past work as a stable attendant was classified as heavy, unskilled work and involved simple, repetitive tasks. There was some discussion between the ALJ, Ms. Karlin, and Dr. Vitolo about Torres's social limitations and whether working with horses would exceed those limitations. Dr. Vitolo testified that interacting with horses would be fine.

The ALJ then asked Ms. Karlin to identify medium exertional jobs assuming a person of Torres's age, education, and prior work experience, who was limited to simple, routine, repetitive jobs involving one- or two-step commands, limited social contact, and low amounts of stress. Ms. Karlin testified that such an individual could perform the jobs of hand packager, cleaner, and meat clerk. Each of these jobs required a medium level of exertion and was unskilled. According to Ms. Karlin, there were: (1) 10,318 hand packager jobs in the local economy and 162,882 in the national economy; (2) 79,178 cleaner jobs in the local economy and 1,058,365 in the national economy; and (3) 2,300 meat clerk jobs in the local economy and 69,583 in the national economy.

On March 14, 2011, the ALJ issued his decision denying Torres's claim for SSI, and on June 15, 2012, the Appeals Council denied Torres's request for review, thereby rendering the decision of the Commissioner final.

## DISCUSSION

### I.   Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Dargahi v. Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010) (citation omitted).

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Soc. Sec. Admin., Comm'r, 683

14

F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would <u>have to conclude otherwise</u>" (citation and internal quotation marks omitted; emphasis in original)).

*Pro se* litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." <u>Green v. United States</u>, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); <u>see Alvarez v. Barnhart</u>, 03 Civ. 8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal *pro se* standard in reviewing denial of disability benefits).

## II.    Timeliness of Filing

Judicial review of cases arising under Title II of the Social Security Act is provided for, and expressly limited by, sections 205(g) and (h) of the Act, 42 U.S.C. §§ 405(g) and (h). Under these provisions, a plaintiff must present his claims in the district court within 60 days after the mailing of notice of a final decision, or within such further time as the Commissioner of Social Security may allow. 42 U.S.C. § 405(g). Here, the Notice of Appeals Council Action was dated June 15, 2012. The notice explained that the date of receipt is presumed to be five days after the date on the notice unless the plaintiff can demonstrate otherwise. Torres filed his complaint with the district court on August 24, 2012, after the 60 day deadline. On September 27, 2012, however, Administrative Appeals Judge Kenneth Matheny granted an extension through August 24, 2012. Therefore, Torres's complaint is timely.

## III.    Definition of Disability

A claimant is disabled under the Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

15

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A

determinable physical or mental impairment is defined as one that "results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be

determined to be disabled only if the impairment(s) are "of such severity that he is not only

unable to do his previous work but cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy . . . ."

42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the Social Security Administration has established a five-

step sequential evaluation process when making disability determinations. See 20 C.F.R. §§

404.1520, 416.920. The steps are followed in order: if it is determined that the claimant is not

disabled at a step of the evaluation process, the evaluation will not progress to the next step. The

Court of Appeals for the Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in
> substantial gainful activity. Where the claimant is not, the Commissioner next
> considers whether the claimant has a "severe impairment" that significantly limits
> her physical or mental ability to do basic work activities. If the claimant suffers
> such an impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt.
> P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe impairment, she has the
> residual functional capacity to perform her past work. Finally, if the claimant is
> unable to perform her past work, the burden then shifts to the Commissioner to
> determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted). A claimant bears

the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It

is only after the claimant proves that she cannot return to prior work that the burden shifts to the

Commissioner to show, at step five, that other work exists in the national and local economies

that the claimant can perform, given her RFC, age, education and past relevant work experience. 20 C.F.R. 404.1560(c)(2); <u>Melville</u>, 198 F.3d at 51.

## IV.    Analysis of the ALJ's Determination

On March 14, 2011, after evaluating Torres's claims pursuant to the sequential evaluation process, the ALJ issued a decision finding that Torres was not disabled. (R. 15-23.) At step one, the ALJ determined that Torres had been engaged in "substantial gainful activity" ("SGA"). Though the ALJ believed the evidence demonstrated that Torres was engaged in SGA throughout the relevant period, he considered the remaining steps, as an alternate finding, because there was no direct evidence in the record of SGA after the "middle of 2010." (R. 21.) At step two, the ALJ found that Torres's mental impairments (*i.e.* major depressive disorder, anxiety order NOS, and substance abuse) were severe. At step three, the ALJ found that Torres's impairments did not meet or equal any of the medical criteria contained in the Commissioner's Listings. At step four, the ALJ found that Torres could perform his past relevant work. Finally, at step five, the ALJ determined that Torres had the capacity to perform other types of jobs specified by the vocational expert.

### A.  Step One: Substantial Gainful Activity

At step one, the ALJ found that "[t]he claimant is and has engaged in 'substantial gainful activity' . . . at all times relevant to this decision." (R. 22.) The ALJ, therefore, concluded that Torres had not been under a disability within the meaning of the Social Security Act since August 19, 2009.

In reaching this conclusion, the ALJ relied heavily on Torres's Concourse counseling records: "Because it is important to the outcome of this appeal, I will set forth here twelve examples of references – some quite specific – in Mr. Torres' records to his continuing to work

17

after (indeed, long after) he claims to have stopped working and become too disabled to do so."

(R. 19.) The ALJ subsequently noted the following citations:

> May 22, 2008 - "Pt. works as a stable hand per diem day laborer and is paid in cash [at] Aqueduct, Belmont, [name ineligible], etc." (R. 275.)

> December 24, 2008 - "Ct. stated his employment is still going well and he enjoys it very much getting up every morning with some place to go." (R. 278.)

> December 31, 2009 - "Ct. states he maintains his employment at the Long Island Race Tracks working as a day laborer. Ct. states he is stable at work." (R. 267.)

> December 31, 2009 – "Client states he works as a day laborer at Long Island race tracks" (R. 268.)

> May 15, 2009 - "Ct. stated he continues to work at the race tracks as a day laborer and everything is going well. Ct works at the Long Island race track Mon-Fri." (R. 281.)

> June 1, 2009 - "Ct. stated he enjoys working at the race tracks." (R. 282.)

> July 3, 2009 - "[T]hings on his job are going well most of the time. Ct. is a day laborer. . . . Ct. has been employed at the race track for 3 years and wants to remain there." (R. 264.)

> August 19, 2009 - "Client states he continues to go to work every day." (R. 289.)

> October 21, 2009 - "Client states he keeps himself busy with his work schedule … working every day keeps him focused." (R. 293.)

> December 9, 2009 - "Ct. states he continues to attend work daily and afterwards he goes home." (R. 295.)

> December 31, 2009 - "Ct. remains employed as a day laborer …." (R. 296.)

> January 13, 2010 - "Ct. stated his employment continues to be stable. Ct. stated he goes to work and back home." (R. 298.)

> May 14, 2010 - "Ct. stated he is now working from Tuesday to Saturday …." (R. 303.)

(R. 19.)

The ALJ's list was not exhaustive. Other detailed statements in the record not cited by the ALJ include the following:

> August 9, 2008 - "Ct. maintains employment at the moment. Ct. states he works off the books." (R. 277.)

> January 13, 2009 - "Ct. stated his employment was going along well. Ct. states he maintains good conduct and does what he is supposed to." (R. 279.)

> February 24, 2009 - "Ct. verbalized he maintains stable employment and at this time there is nothing to report." (R. 279.)

> September 9, 2009 - "Ct. stated before he started his psych treatment he was not functioning very well at home or work." (R. 292.)

Some of the Concourse counselor notes indicate that Torres was having difficulty at work, though the ALJ did not include these portions of Torres's statements in his decision. "Client states he continues to go to work every day but is having difficulties due to his lack of sleep and depression." (R. 289.) "Ct reports employment stress and conflict with co-workers at times." (R. 264.) In an undated document that appears to be from in or around January 2007, the counselor noted that Torres's only work experience was at the Long Island race track as a horse trainer for nine years, and he expressed an aspiration of returning to work. An addendum was added on July 8, 2008, stating that Torres went back to work as a day laborer at Long Island race track.

While some of the work references in the Concourse notes are dated before the relevant period, the ALJ viewed all of these references as evidence of Torres's lack of credibility. The counselor's notes directly contradicted Torres's testimony that he had not worked since 2001. The ALJ specifically asked Torres about these notations during the administrative hearing, with Torres responding, "I never worked." (R. 33.) When asked why the therapist would write that he was working, Torres responded, "I don't remember saying that to her. I haven't worked. Maybe you can ask her the information by writing because I haven't worked." (R. 33.)

19

After a brief recess, Torres returned with an explanation of the work notations: "[The counselor] wanted me to go to the program to pick up my medicine only once so I did not have to go seven days a week. She told me she wasn't going to go to court if I agree that she would write down that I was working. Because I wanted medication and I don't want to have to go back there seven days a week, I accepted." (R. 34-35.) The ALJ ultimately found this explanation to be "downright nonsensical." (R. 21.)

The initial question before this Court is whether there is substantial evidence in the administrative record to support the ALJ's determination that Torres was engaged in SGA throughout the relevant period. As cited above, the Concourse medical records provide strong support for such a conclusion. There is some evidence in the record, however, to suggest that Torres was not engaged in SGA: (1) Torres's own testimony that he had not worked since 2001; (2) the Social Security Administration documents showing no earnings for 2002 to 2010; and (3) Dr. Patel's notes indicating his belief that Torres could not work.

### 1.  Evidence Against SGA Finding

#### a.  Torres's Testimony

At his hearing, Torres stated that he had not worked since 2001. The ALJ did not believe Torres's testimony regarding his work history and specifically stated so in his decision. "Mr. Torres has some very serious credibility problems, to say the least. His records so clearly, frequently and specifically document his ongoing, full-time work activities that I can and do conclude that he was simply not telling the truth about them." (R. 20.) The ALJ further stated, "I made it perfectly clear to claimant and counsel that I did not believe that claimant had not been working, and did not believe his explanation of how his records came to state otherwise." (R. 18.)

20

As further evidence of his lack of trustworthiness, the ALJ cited the conflicting evidence in the record regarding Torres's interaction with friends and family. Sometimes Torres denied having any friends or seeing his family, and at other times he stated that he engaged with friends and family members on a regular basis. Finally, the ALJ described Torres as "trying to portray himself as far less functional than he is." (R. 21.)

In general, it is the function of the ALJ, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983); see Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 113 (2d Cir. 2010) (same). A credibility finding by an ALJ is entitled to deference by the reviewing court and will be set aside only if it is not set forth "with sufficient specificity to enable [a reviewing court] to decide whether [it] is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); see Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995) ("Deference should be accorded [to] the ALJ's [credibility] determination because [the ALJ] heard plaintiff's testimony and observed his demeanor.").

Here, the ALJ's credibility finding is set forth with sufficient specificity. The ALJ specifically addressed Torres's testimony as to his work history, his psychiatric symptoms, and his social interactions.  The ALJ did not discredit Torres's complaints entirely, concluding that Torres suffered from the severe impairments of major depressive disorder, anxiety disorder NOS, and some substance abuse. Furthermore, the ALJ clearly articulated why he did not believe that Torres's testimony was credible in the face of other objective evidence in the record. See Campbell v. Astrue, 465 F. App'x. 4, 7 (2d Cir. 2012) (stating that the inconsistency between plaintiff's testimony and his medical records weighed against a positive credibility finding).

21

There is substantial evidence in the record to support the ALJ's negative credibility determination. The statements recorded in the Concourse medical records are consistently at odds with Torres's testimony regarding his work history. In addition, there are many other inconsistencies in the record. Torres reported different dates for when he stopped working: 1995, 1999, 2000, and 2001. Torres gave different reasons for the cessation of his employment with the race track: (1) he was dismissed when a random drug test revealed cannabis; and (2) he witnessed the death of a co-worker. Torres informed Dr. Meadow that he had been a patient of Dr. Patel's for ten years, when he only began seeing Dr. Patel in July of 2009, less than three months prior. Torres also denied having a history of drug and alcohol use when asked by Dr. Meadow. Finally, there are discrepancies as to Torres's level of education: fifth grade, ninth grade, tenth grade, special education, and high school graduate.

While Torres's inability to speak or understand English could account for some of these discrepancies, the sheer number of them on a diverse range of facts raises serious doubts about the credibility of his testimony. Furthermore, Torres had an interpreter present at the hearing, and the Concourse counselor notes indicate that Torres was assisted by a translator at some, if not all, of his appointments with Dr. Patel. The inconsistencies between Torres's oral testimony and the documentary record, as well as the internal inconsistencies in the documentary record, constitute substantial evidence supporting the ALJ's negative credibility determination. See Pidkaminy v. Astrue, 919 F. Supp. 2d 237, 251-52 (N.D.N.Y. 2013) (affirming ALJ's determination as to credibility when the ALJ considered inconsistent statements about work history as well as other indicia of credibility).

**b. Social Security Administration Records**

Torres's earnings report from the Social Security Administration also supports his statement that he was not engaged in SGA during the relevant period. This document indicates that Torres had no earnings from 2002 through 2010. The ALJ considered his apparent lack of earnings and determined that Torres was "working off the books." (R. 21.) The Concourse records appear to support this conclusion. A note dated May 22, 2008, indicates that Torres was being paid in cash. And on August 9, 2008, the counselor's notes state that he was "working off the books." The ALJ did not believe a further inquiry into actual earnings was required when "the claimant is actively concealing information about how much he is earning." (R. 21.)

Some courts have recognized that a claimant's "off the books" work did not amount to SGA. See e.g., Barone v. Astrue, 09 Civ. 7397 (KBF)(DF), 2011 WL 7164421, at *9 n.6 (S.D.N.Y. Dec. 27, 2011) (noting that the ALJ appeared to give the claimant the benefit of the doubt on the question of SGA even when there was some evidence that plaintiff worked off the books); Tirado v. Astrue, 10 Civ. 2482 (ARR), 2012 WL 259914, at *1 (E.D.N.Y. Jan. 25, 2012) (noting that the ALJ concluded that claimant did not engage in verifiable SGA when he worked off the books); Katsigianis v. Astrue, 06 Civ. 6295 (DLI)(CLP), 2009 WL 750215, at *4 (E.D.N.Y. Mar. 19, 2009) (noting that the ALJ gave the claimant the benefit of the doubt regarding SGA even though there was some evidence he worked "off the books").

Here, however, the ALJ described Torres's work as "fully meet[ing] the definition of SGA set forth or explained in 20 CFR Sections 404.1520, 1572 and 1573 ...." (R. 21.) Specifically, work activity "that involves significant physical or mental activities" and that is performed for "pay or profit" whether or not a profit is realized. 20 C.F.R. § 404.1572. The SSA does not require on the books employment for purposes of an SGA finding. Thus, although tax

23

returns are persuasive evidence of gainful employment, the absence of such evidence does not preclude a finding of SGA at step one. Based on the repeated and detailed counselor notes, the ALJ concluded that Torres's work was full-time. This conclusion is supported by substantial evidence.

### c.  Dr. Patel's Notes

On September 9, 2009, Dr. Patel wrote a note addressed to the City of New York Human Resources Administration regarding Torres's ability to work. Dr. Patel stated, "This is to inform you that Mr. Hiram Torres suffers from severe depression with psychotic features and is also in the process of getting an evaluation for memory impairment. . . . At this time, I don't think he is capable to work pending stabilization of his mental problems and evaluation for memory impairment." (R. 371.) Again on November 12, 2009, Dr. Patel checked a box that Torres was temporarily unemployable, but he did not specify when he would be able to participate in work-related activities.

The ALJ did not specifically address these statements by Dr. Patel. He did note that it appeared Dr. Patel was not aware of the Concourse counselor notes indicating that Torres was in fact working during this period. While the ALJ must give controlling weight to a medically-supported treating physician's opinion, as is discussed below, Dr. Patel's statements are considered here only to determine whether Torres was actually engaged in SGA. Dr. Patel's belief that Torres could not work, at least up until November 2009, does not categorically disprove that he was in fact working, as he repeatedly told his counselor.

### 2.  Duty to Develop the SGA Record

The Court must further consider whether the ALJ properly fulfilled his duty to develop the record as to Torres's work history. When the ALJ assesses a claimant's alleged disability, the

ALJ must develop the claimant's medical history for at least a twelve-month period. 42 U.S.C. § 423(d)(5)(B), 20 C.F.R. § 404.1512(d). Further, the Act authorizes the Commissioner to "issue subpoenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation." 42 U.S.C. § 405(d).

The Court of Appeals for the Second Circuit considers this statutory authorization to impose an affirmative duty on the ALJ to develop the record. Indeed, before a district court can evaluate the ALJ's conclusions, the court must ensure that the claimant received a full hearing. Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (holding that an ALJ must ensure that the claimant had a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act" (citing Gold v. Secretary of HEW, 463 F.2d 38, 43 (2d Cir. 1972))). Due to the "non-adversarial nature" of social security proceedings, a full hearing requires the ALJ to "affirmatively develop the record." Echevarria, 685 F.2d at 755. Whether or not the claimant is represented by counsel, Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999), the ALJ must contact medical sources and gather any additional information if the ALJ believes that the record is inadequate to make a determination. When the ALJ has failed to develop the record adequately, the district court must remand to the Commissioner for further development.  See, e.g., Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

The duty to develop the record applies to "any matter under investigation." 42 U.S.C. § 405(d). This includes records relating to work history. Rivera v. Barnhart, 379 F. Supp. 2d 599, 605 (S.D.N.Y. 2005) (remanding for failure to fully develop the record with regard to the claimant's work history and alleged disability); Warren v. Astrue, 12 Civ. 6043, 2013 WL 425938, at *2 (W.D.N.Y. Feb. 1, 2013) (ALJ has a heightened duty in *pro se* cases to develop the record with respect to employment and earnings); Williams v. Mathews, 427 F. Supp. 63, 66

25

(S.D.N.Y. 1976) (remanding where ALJ failed to subpoena employment records from uncooperative employer and then held against claimant for lack of evidence). See also Milton v. Schweiker, 669 F.2d 554, 556 (8th Cir. 1982) (ALJ's duty to develop record "includes gathering evidence so that a just determination of disability may be made"; remanding and ordering ALJ to obtain *pro se* claimant's medical and employment records).

This duty, however, is not without limit. The ALJ "shall make every *reasonable* effort" to develop the record. 42 U.S.C. § 423(d)(5)(B) (emphasis supplied). But the ALJ is not required to "resolve every inconsistency and ambiguity in the record." Bluvband v. Hecker, 730 F.2d 886, 892 (2d Cir. 1984) superseded by statute on other grounds as recognized in Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

Faced with powerful evidence that Torres was working throughout the relevant period against his protestations that he was unable to work, the ALJ held the record open to allow counsel to present additional information about Torres's work history. Nothing was forthcoming. After four weeks without supplemental submissions, the ALJ was under no further obligation to develop the record. See Colon v. Apfel, 98 Civ. 4732 (HB), 2000 WL 282898, at *5 (S.D.N.Y. Mar. 15, 2000) (ALJ under no further obligation to develop the record once counsel indicated that he would try to provide additional pertinent information and the ALJ held the record open); see also Weingarten v. Apfel, 98 Civ. 2475 (HB), 1999 WL 144486, at *4 (S.D.N.Y. Mar. 17, 1999) (ALJ satisfied his duty to develop the record where claimant's counsel indicated he would submit additional medical records within one week after hearing); Robinson v. Carter, 94 Civ. 0057 (SHS), 1996 WL 5067, at *7 (S.D.N.Y. Jan. 5, 1996) (ALJ satisfied his duty to develop the record where claimant's representative indicated that he would submit additional medical records within three weeks after the hearing). Torres's failure to submit evidence about his

26

unemployment – such as an exculpatory statement from the race track or an explanation from his counselor about the references to his employment[5] – is particularly meaningful because it is the petitioner's burden to establish that he did not engage in SGA. See 20 C.F.R. § 404.1512(a) (the claimant must prove that he is not disabled); see also Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) (the claimant bears the burden of proof at steps one through four); Figueroa-Plumey v. Astrue, 764 F. Supp. 2d 646, 650 (S.D.N.Y. 2011) (claimant bears the burden of establishing the lack of engagement in SGA).

Because there is substantial evidence in the record to support the ALJ's finding that Torres was working, including evidence that he worked fulltime and was paid $8 an hour, and because the ALJ held the record open to allow Torres to submit further evidence regarding his non-employment, the ALJ was not under a duty to further develop the record. See Cichocki v. Astrue, 12 Civ. 3343, 2013 WL 4750284, at *4 (2d Cir. Sept. 5, 2013) (no duty to obtain further records regarding claimant's work history where substantial evidence supports ALJ's disability determination). See also Brault, 683 F.3 at 448 ("[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and internal quotations marks omitted; emphasis in original)). But even if the ALJ should have done more – such as subpoena the race track's employment records, see 42 U.S.C. § 405(d) (issuance of subpoenas in administrative proceedings) – the ALJ proceeded to the next step in the sequential analysis. Thus, any error here is harmless.

---

[5] In his opposition to the Commissioner's motion, Torres attached a letter from his counselor, dated July 2, 2013. The Court considers this letter only to note that it indicates that he was on a one day a week schedule "due to traveling hardship." This ambiguous statement leaves open the possibility that Torres is traveling to work.

### B.  Step Two: Severe Impairment

At step two, the ALJ concluded that Torres had the following "severe" impairments: major depressive disorder, anxiety disorder NOS, and some substance abuse. Substantial evidence supports the ALJ's determination, including Torres's own testimony and the findings of Drs. Patel, Blackwell, Meadows, and Vitolo. While Torres also raised physical impairments as a basis for his benefits application, his attorney explicitly stated that he was only claiming a psychiatric impairment, and the ALJ did not consider any physical impairments as a basis for Torres's claim.

### C.  Step Three: Impairment List

At step three, the ALJ determined that Torres's severe impairments did not meet the criteria for a *per se* disability as set forth in the applicable Social Security Regulations. See 20 C.F.R. Pt. 404, Subpt. P, App'x 1; 20 C.F.R. 404.1520(d), 404.1526, 416.920(d), 416.925, 416.926. The ALJ concluded that the only evidence that Torres might have a "Listings-level impairment" was the line checked in Dr. Patel's October 30, 2010 report next to the following language:

> Medically documented history of a chronic organic mental, schizophrenic, or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

(R. 21, 359.) This language is identical to that found in subsection C(2) of the listings criteria in the applicable Social Security Regulations. See 20 C.F.R. Part 404, Subpt. P, App'x 1 at § 12.02. The ALJ, however, explicitly rejected Dr. Patel's assessment, finding that the evidence overwhelmingly refuted his "checkoff adoption of that criterion." (R. 21.) The ALJ agreed with

28

the assessments of Dr. Vitolo and Dr. Blackwell that Torres's conditions fell short of listings-level severity.

### 1.   The Treating Physician Rule

The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well-supported by medical findings and is not inconsistent with the other evidence in the record.  20 C.F.R. § 404.1527(c)(2). In this Circuit, the rule is robust. The ALJ cannot discount a treating physician's opinion unless the ALJ believes that it "lack[s] support or [is] internally inconsistent." Duncan v. Astrue, 09 Civ. 4462 (KAM), 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011). See also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."); Rivera v. Comm'r of Soc. Sec., 728 F. Supp. 2d 297, 327 (S.D.N.Y. 2010) (finding the ALJ validly rejected the treating physicians' opinions because they conflicted with plaintiff's admitted daily activities and other evidence in the record; thus, remand for reapplication of the treating physician rule was not appropriate). A report by a consultative physician may constitute substantial evidence when the treating physician's opinion is inconsistent with other substantial evidence in the record. Guzman v. Astrue, 09 Civ. 3928 (PKC), 2011 WL 666194, at *9 (S.D.N.Y. Feb. 4, 2011).

If the ALJ decides to discredit the opinion of a treating physician, the ALJ must follow a structured evaluative procedure.  This procedure evaluates the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how

consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors.  20 C.F.R. § 404.1527(c)(2)-(6).  This process must be transparent: the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  20 C.F.R. § 404.1527(c)(2).  Indeed, where an ALJ does not credit the findings of a treating physician, the claimant is entitled to an explanation of that decision.  Snell, 177 F.3d at 134.

The decision on the ultimate issue of disability, however, is one reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(2); see Snell, 177 F.3d at 133 ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative."). Specifically, whether the claimant has an impairment that meets or equals a Listings-level impairment is a determination reserved to the Commissioner, and a treating physician's opinion regarding the criteria for a Listing is not entitled to controlling weight. See Hendricks v. Comm'r of Social Sec., 452 F. Supp. 2d 194, 199 (W.D.N.Y. 2006) (while the ALJ must still consider the treating physician's opinion regarding the criteria for a Listing, the opinion is not entitled to controlling weight.)

While Torres is not entitled to have Dr. Patel's opinion on the ultimate question of disability be treated as controlling, he "is entitled to be told why the Commissioner has decided—as under appropriate circumstances is his right—to disagree with" Dr. Patel. Snell, 177 F.3d at 134. "Reserving these issues to the Commissioner relieves the SSA of having to credit a doctor's finding regarding these issues, but that "does not exempt [the ALJ] from [his] obligation . . . to explain why a treating physician's opinions are not being credited." Guzman v. Astrue,

2011 WL 666194, at *10 ("when the ALJ gives the treating physician's opinion less than controlling weight, he must provide good reasons for doing so").

### 2. Application to Listing Assessment

Here, the ALJ did explain his reason for rejecting the treating physician's opinion. The ALJ concluded that Dr. Patel's "checkoff adoption" of the Listings section C(2) criterion was overwhelmingly refuted by the rest of the evidence in the record. The ALJ expressed his agreement with Drs. Vitolo and Blackwell, both psychologists who examined only the medical record, that Torres's conditions fell "far short of Listings-level severity." (R. 20.) In addition, the ALJ noted that while Dr. Patel stated that Torres's condition constituted "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate" (R. 20), Dr. Patel also indicated that Torres's abilities were only "seriously limited, but not precluded" or "limited but satisfactory." Furthermore, the ALJ stated that the Concourse chart notes demonstrated that while Torres had fairly serious symptoms in July 2009, he was already improving by August 2009 and remained stable for the majority of the period indicated in the notes, except briefly in February 2010 and June 2010 when he ran out of medication. The ALJ determined that Torres was "stable and doing reasonably well, and of course, the notes repeatedly document him as working." (R. 20.)

The ALJ also discussed the evaluations of three other physicians: Dr. Herbert Meadow, a consultative psychiatrist who evaluated Torres on October 26, 2009; Dr. L. Blackwell, a DDS review psychologist; and Dr. Vitolo, a psychologist who was the testifying expert at Torres's administrative hearing. Both Drs. Meadow and Blackwell indicated that Torres's impairments did not prevent him from functioning on a daily basis. In addition, Dr. Vitolo stated that Torres's

functioning was no more than "moderately limited." (R. 45.) Dr. Vitolo further stated that he could find no evidence of memory problems to support Dr. Patel's conclusion. Given the medical evidence before him, the ALJ concluded that "Dr. Patel's functional assessment . . . [was] not borne out by the evidence, including the Concourse records." (R. 20.)

Given the lack of supporting medical evidence for Dr. Patel's finding and the conflicting information within Dr. Patel's own report, the Court concludes that there is substantial evidence to support the ALJ's finding that Torres's disabilities did not satisfy the C(2) criteria of the Listings. See e.g., Hohl v. Chater, 95 Civ. 4479 (DC), 1997 WL 651472, at *7 (S.D.N.Y. Oct. 20, 1997) (affirming an ALJ's determination that the claimant's impairment did not equal a "listings-level impairment" despite a treating physician's indication that it did).

### D.  Step Four: Residual Capacity to Perform Prior Work

The ALJ found, assuming *arguendo* that there was at least some period relevant to this appeal in which Torres was not performing SGA, that Torres's limitations were fully consistent with his previous work. First, the ALJ found that Torres had the residual functional capacity to perform a full range of work at all exertional levels so long as it involved simple, repetitive, low stress work tasks with one- or two-step commands and limited amounts of social interaction.

Under the treating physician rule, the ALJ was required to give Dr. Patel's opinion controlling weight on whether or not Torres's impairments prevented him from being able to engage in substantial gainful activity. In explaining his determination, the ALJ did not explicitly invoke the treating physician rule. He did, however, note that Dr. Patel was Torres's psychiatrist at the time of his 2010 report, and further noted that some of the evidence, including Dr. Patel's report, were from Torres's "treating clinic." (R. 20.) These are strong indicia that the ALJ was aware of the treating physician rule and applied it. See Rivera, 728 F. Supp. 2d at 326

(concluding that though the ALJ did not expressly refer to the doctors as "treating physicians" his opinion strongly implied that he regarded them as such). The key question is whether the ALJ "traversed the substance of the treating physician rule." Halloran, 362 F.3d at 32 (concluding that where an ALJ does not "traverse[]" the substance of the treating physician rule, a failure to expressly acknowledge the treating physician rule does not require remand). Thus, the ALJ's failure to cite specifically to the treating physician rule does not alone amount to legal error.

The ALJ found that Dr. Patel's own records supported the finding that Torres would be "capable of performing simple and unskilled types of work activity." (R. 22.) The ALJ stated that Dr. Patel admitted uncertainty about the effect of Torres's conditions on a number of work-related functions. Dr. Vitolo noted during his testimony that Dr. Patel did not indicate a markedly impaired claimant with regard to RFC. At most, Torres was moderately limited. Thus, the ALJ did not reject Dr. Patel's opinion on the types of work activity Torres could perform but rather believed Dr. Patel's assessment supported his finding.

The medical evidence when taken as a whole provides substantial evidence that Torres could work with the limitations cited by the ALJ. The limitations set forth by the ALJ coincide with Dr. Patel's 2010 report. Though Dr. Patel did check the C2 Listings criteria, in that same report he indicated that Torres had limited but satisfactory ability to understand, remember, and carry out very short and simple instructions. He could satisfactorily maintain regular attendance, be punctual within custom, and make simple work-related decisions. Furthermore, Dr. Patel checked nothing more significant than "seriously limited, but not precluded" for each of the mental abilities and aptitudes for unskilled, semi-skilled, and skilled work. (R. 360.) This opinion from Torres's treating physician supports the ALJ's conclusion that Torres had the residual functional capacity to perform a full range of work at all exertional levels so long as it involved

simple, repetitive, low stress work tasks with one- or two-step commands and limited amounts of social interaction.

Dr. Patel did indicate in September and November of 2009 that he did not believe that Torres could work. These notes, however, must be considered in light of the counselor notes during this same period indicating that Torres was working. Dr. Patel also indicated that Torres had a memory impairment. The ALJ did not include this in his RFC determination because it was unsupported by the other medical evidence in the record.

At step four, after a determination on Torres's RFC, the ALJ concluded that Torres could return to his work as a stable hand. At the hearing, the ALJ specifically directed Ms. Karlin, the vocational expert who testified at Torres's hearing, to consider the limitations outlined by Dr. Vitolo. These indicated that Torres would be capable of performing simple, repetitive, low stress work tasks with one- or two-step commands and a limited amount of social interaction. The ALJ initially expressed at the hearing that he suspected that the job of a stable hand would not be simple, repetitive, one- or two-step commands, low in stress with limited social contact. In response, Ms. Karlin stated that Torres's job as a stable hand was considered both unskilled and "a simple repetitive job." (R. 47.) There was some discussion at the hearing about whether or not working with the horses constituted social contact such that Torres would have difficulty returning to such work given the constraints of his condition. Dr. Vitolo did not believe that working with the horses would exceed Torres's social limitations. The Court concludes that the ALJ's determination that Torres could return to his former work as a stable hand should be affirmed because the ALJ did not err in his application of the treating physician rule and there is substantial evidence to support such a finding.

### E.  Step Five: Other Work

Based on Torres's RFC, the ALJ concluded that "even if Step 5 were reached, …

claimant has the mental capacity to perform the other types of jobs [the vocational expert]

specified . . . ." (R. 22.) The ALJ's determination at step five is supported by substantial

evidence.

"If a claimant has nonexertional limitations that 'significantly limit the range of work

permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert."

Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010). Here, the ALJ did just that. During the

administrative hearing, the ALJ asked a vocational expert to identify available jobs for an

individual of Torres's age, education, and prior work experience, who was limited to simple,

routine, repetitive jobs involving one or two step commands, limited social contact, and low

amounts of stress. The limitations set forth by the ALJ were the same ones used at step four: the

limitations identified by Dr. Vitolo, the testifying physician. As noted above, these limitations

also are similar to the limitations noted by Dr. Patel, though they do not include specific mention

of Torres's limited concentration and pace or his memory impairment.

The vocational expert identified a hand packager, a cleaner, and a meat clerk as jobs that

met these criteria and existed in significant numbers in the national and regional economy. An

ALJ is entitled to credit the testimony of a vocational expert. Bavaro v. Astrue, 413 F. App'x

382, 384 (2d Cir. 2011) (refusing to disturb an ALJ's finding as to the availability of jobs at the

national and regional level based on proclamations of a decline in the particular industry). A

vocational expert's "recognized expertise provides the necessary foundation for his or her

testimony." Decker v. Astrue, 11 Civ. 5593 (PGG)(GWG), 2013 WL 4804197, at *19 (S.D.N.Y.

2013) (citation and quotation marks omitted).

At the administrative hearing Torres's attorney asked only two questions of the vocational expert, neither of which challenged the credibility of the source of the vocational expert's numbers. Nor did Torres raise any challenges to the vocational expert's testimony in his complaint or reply. Given the ALJ's reliance on the testimony of a vocational expert and the use of the same RFC identified at step four, the ALJ's determination at step five should be affirmed.

## CONCLUSION

Based on the evidence in the administrative record, the ALJ had substantial evidence to conclude that Mr. Torres was not "disabled" as that term is defined in the Social Security Act and regulations because (1) he was engaged in SGA, thereby failing to pass step one of the evaluation, or in the alternative, (2) he did not have a Listing-level disability and was able to perform either his prior work or medium exertional unskilled work that took into account the limitations of Torres's impairments. Accordingly, I recommend that the Commissioner's motion for judgment on the pleadings be GRANTED in its entirety. I further recommend that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith and, therefore, that *in forma pauperis* status be denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

\*              \*              \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules

of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service

is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another

party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the

chambers of the Honorable Laura Taylor Swain at the Daniel Patrick Moynihan Courthouse, 500

Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing

objections must be addressed to Judge Swain. The failure to file these timely objections will

result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 6(a), 6(b), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge


DATED:      New York, New York
            December 13, 2013




cc:         Hiram Torres (*By Chambers*)
            1235 Woodcrest Avenue
            Apt 6E
            Bronx, NY 10452

37